UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

Criminal No. 13-140 (MJD/AJB)

v.

**REPORT AND RECOMMENDATION**

Chandan Prentiss Hurd,

        Defendant.

        LeeAnn K. Bell and Manda M. Sertich, Assistant United States Attorneys, for the plaintiff, United States of America;

        Shannon R. Elkins, Assistant Federal Defender, for defendant Chandan Prentiss Hurd.

        This action came on for hearing before the Court, Chief Magistrate Judge Arthur J. Boylan, on August 5, 2013, at the U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota. The court has issued a separate Order on Motions, dated August 6, 2013, reserving defendant's motion for suppression of evidence for submission to the district court on report and recommendation.

        Based upon the file and documents contained therein, along with testimony and exhibits received at hearing, the magistrate judge makes the following:

**Findings**

        During the early morning hours of March 23, 2013, Minneapolis Police Officers Martin and Englund were patrolling the city's Second Precinct in their squad car. Martin was driving. As the squad traveled east on Broadway Street, it approached the intersection with Buchanan Street. This area surrounding Broadway and Buchanan is one of the more highly-patrolled areas

of the Second Precinct, and has a higher level of criminal activity than other areas within the Precinct. Much of the criminal activity involves narcotics or domestic disputes.

At approximately 12:15 a.m., the officers observed a vehicle facing northbound on Buchanan just north of that street's intersection with Broadway. The vehicle drew their attention because it was stopped in the middle of the street. The area is darkly lit but the officers noticed that a male, despite the cold weather, was standing outside the car next to the driver's side. Immediately to the north of the intersection where the vehicle was stopped, on either side of the street, there are no houses or other buildings.

Based on his experience and the circumstances of the stopped vehicle, Officer Martin suspected a possible narcotics transaction.

Upon making his observations, Martin stopped, backed the squad up and turned left onto Buchanan, pulling up behind and to the side of the vehicle. At that same time, Englund called dispatch, reporting that they were checking on a suspicious vehicle. Once the squad car pulled up behind the stopped car, the driver of the vehicle pulled off to the side of the road approximately 20 to 30 feet ahead. Meanwhile, the man, later identified as defendant Hurd, continued to stand in the middle of the street. Officers Martin and Englund did not activate the squad car lights or video recorder. One of the officers turned on the squad's spotlight.

Immediately upon the police car pulling up, Hurd started walking toward the squad. While approaching the officers, Hurd had his hands in the pockets of his jacket. The officers, concerned for their safety, immediately got out of their squad. While doing so, they directed Hurd to remove his hands from his pockets as they were uncertain about whether he was armed. As Hurd continued to approach, Martin noticed that Hurd had a blank stare on his face. It appeared to Martin as though Hurd was trying to decide what to do or that he was possibly high

or intoxicated. In addition to noting Hurd's demeanor, Officer Martin estimated that Hurd was six-foot, three inches tall and weighted approximately three hundred pounds and that as such, that he was physically larger than either Martin or Englund. As he approached the officers, Hurd was saying something to the effect that there's no problem here; I'm just trying to give the driver directions.

In compliance with the officers' command, Hurd momentarily took his hands out of his pockets as he continued to walk toward them. After about five seconds, however, Hurd placed his hands back in his pockets while continuing to walk towards the officers. Both officers then began approaching Hurd. As they did so, they continued to command that he take his hands out of his pockets. Officer Martin did not ask Hurd his name nor did they tell him to stop approaching.

Once Officer Martin was within arms-length, he grabbed Hurd's right arm to control it so that Hurd could not pull something out of his pocket. Officer Englund grabbed Hurd's left arm. The officers continued to command Hurd to take his hands out of his pockets. Following Hurd's refusal to remove his hands, the officers attempted to pull his hands from his pockets, but Hurd resisted. Eventually, the officers maneuvered Hurd to the hood of the squad car. By this point, Officer Martin believed that Hurd was hiding something. In an attempt to have Hurd comply with the police commands, Officer Martin drew his Taser and warned Hurd that he could be tased if he did not do as directed. The officers continued to direct Hurd to take his hands out of his pockets and Hurd continued to refuse. The officer's struggle with Hurd continued with their trying to draw Hurd's hands out of his pockets. Their efforts included their delivering strikes to his back area as Hurd was leaned over the hood, in an attempt to get Hurd to remove his hands.

During this interaction, the female driver of the stopped vehicle, Ashley Squalls, exited her car and started walking toward the officers. Officer Martin pointed his Taser at Ms. Squalls and directed her to sit on the curb behind her vehicle. Upon Squall's compliance with his order, Officer Martin re-holstered his Taser and called for a back-up squad.

During the time he was ordering Ms. Squalls to the curb, Officer Martin was still holding onto Hurd's right arm. Eventually, Martin used his other hand to grab Hurd's right wrist, in an attempt to pull Hurd's hand out of his pocket. As Officer Martin grabbed Hurd's wrist, he felt the butt of a handgun. He looked down and saw the base plate and magazine of the gun in Hurd's right pocket. Officer Martin called out his observation to Officer Englund. He also called dispatch to report the gun and requested back-up a second time. Officer Martin pinned Hurd's arm to the squad with his left hand and drew his gun with his right hand to secure the situation.

A second squad arrived and its officers assisted Martin and Englund in holding Hurd's arms. Officer Martin then reached in and was successful in pulling the gun out of Defendant's right jacket pocket. The hammer was pulled back on the gun, but the safety was on. Following his seizure of the gun, Martin secured it in his squad car. Meanwhile, Hurd was handcuffed and placed under arrest by other officers.

Based upon the foregoing Findings, the Magistrate Judge makes the following:

**Conclusions**

**Initial Stop.** Suppression of evidence based upon an unlawful *Terry* stop is not required. Consistent with the Fourth Amendment, an officer may conduct a brief, investigatory stop when the officer has a reasonable articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

4

Officers Martin and Englund had a reasonable and articulable suspicion of criminal activity to justify an investigative stop of Hurd and the stop was not in violation of Hurd's constitutional rights.[1] Hurd argues that Officers Martin and Englund did not have reasonable articulable suspicion, asserting that the stop was based on nothing more than Officer Martin's hunch and generalized suspicion. The primary bases for reasonable suspicion are a police officer's personal observations and the officer's knowledge that a crime has been committed. In assessing the reasonableness of the suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Cortez*, 499 U.S. 411, 418 (1981). Officer Martin's suspicions were justified when he observed a car parked in the middle of the road with an individual standing next to the driver's window.[2] The officer's suspicions regarding Hurd standing next to the driver's side of the vehicle in the middle of the road were particularly justified because it was the middle of the night, the car was on a dark street in a poorly-lit area, with no houses or businesses around, it was a cold night where it would be unusual for a person to be standing outside, and the car was in a higher crime area known for

---

[1] The government argues that the officers needed no reasonable articulable suspicion for their initial interaction with Hurd because the interaction was not a seizure of Hurd. The government asserts that Hurd was not seized until the officers grabbed his arms, and thus their initial actions of pulling their squad car over behind Hurd and the vehicle on Buchanan Street and thereafter demanding that Hurd remove his hands from his pockets did not implicate Hurd's Fourth Amendment rights. A seizure occurs when a reasonable person feels that they are not free to leave or would not feel free to terminate the encounter with law enforcement. *Florida v. Bostick*, 501 U.S. 429, 435-36 (1991). Whether or not pulling up behind an already stopped vehicle constitutes a police stop, the Court finds that the officers had reasonable articulable suspicion to stop Hurd given the totality of the circumstances as discussed above.

[2] There was some conflicting testimony regarding the placement of Ms. Squalls' car in the road when the officers first observed the car. Hurd and Ms. Squalls testified that her car was not stopped in the middle of the road when the squad car turned onto Buchanan Street, but rather that the car was already parked near the curb and Ms. Squalls did not move her car after the officers turned onto Buchanan Street. The Court did not find this testimony credible and credits Officer Martin's testimony regarding the placement of Ms. Squalls' car in the road.

narcotics transactions. *See United States v. Cornelius*, 391 F.3d 965, 967 (8th Cir. 2004) (location of stop in high narcotics area or area with propensity for criminal activity is factor properly considered in assessing reasonable suspicion); *United States v. Knox*, 950 F.2d 516, 519 (8th Cir. 1991) (initial stop justified in part by time of night and location of car in high crime neighborhood). These factors were more than just a generalized suspicion or hunch as Defendant argues. Considering the totality of circumstances, the Court concludes that Officers Martin and Englund had a particularized and objective basis to suspect that a narcotics transaction was underway.[3]

**Protective Frisk.** Suppression of evidence obtained by a protective frisk of Defendant is not required. An officer making an investigatory stop may conduct a limited pat-down frisk of a suspect if the officer has a reasonable belief that the suspect poses a safety threat. *See United States v. Cornelius*, 319 F.3d 965, 967-68 (8th Cir. 2004). A "protective frisk is constitutionally reasonable when a police officer 'observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous.'" *Cornelius*, 391 F.3d at 968 (quoting *Terry*, 392 U.S. at 30).

Officers Martin and Englund had a reasonable belief that Defendant may be armed and dangerous, justifying a protective frisk. As discussed above, the Court has already concluded that there was reasonable suspicion that criminal activity was afoot based on a totality of the circumstances. Defendant's refusal to remove his hands from his pockets while moving toward the officers, despite the officers' repeated commands that he do so, justified the officers' actions in grabbing Defendant's arms, placing him on the hood of the car, and conducting a protective

---

[3] Officer Martin also could observe that Ms. Squalls' vehicle, parked in the middle of the road, was obstructing traffic, giving him another objective justification for the investigatory stop.

6

frisk. Officer Martin testified regarding his safety concerns, based on his training and past experience, specifically his concern that Hurd may have had a weapon. "A *Terry* stop involves a police investigation at close range. . .and it is reasonable for officers to fear for their safety," particularly when "acting in a swiftly developing situation." *United States v. Morgan*, No. 12-4043, -- F.3d --, 2013 WL 4798896, at *3 (8th Cir. Sept. 10, 2013) (internal citations omitted). Here, the officers were dealing with a swiftly-developing situation in which Hurd began approaching them with his hands in his pockets immediately upon the officers' arrival and Hurd placed his hands back in his pockets after momentarily complying with the officers' request.[4] The totality of the circumstances, including Defendant's movement toward the officers with hands in his pockets and his refusal to follow the officers' orders to remove his hands from his pockets, together with Officer Martin's experience with individuals who conceal weapons by placing their hands in their pockets, gave rise to a reasonable suspicion that Defendant was armed and dangerous and thus justified the officers' actions. *Cornelius*, 391 F.3d at 967-68 (defendant's placing his hand in his jacket pocket and failure to follow officer's direction to remove his hand from his pocket gave rise to reasonable suspicion that defendant was armed and dangerous justifying officer's actions in grabbing defendant's arm, leaning him over hood of squad car, and conducting pat-down search); *Knox*, 950 F.2d at 519 (defendant's "great

---

[4] There was some conflicting testimony regarding whether the officers again commanded Hurd to remove his hands from his pockets after he placed his hands in his pockets a second time. Hurd testified that after he had placed his hands back in his pockets a second time, the officers did not ask him to remove his hands from his pockets again, but rather that he engaged in an extended conversation with the officers in response to the officers' questions regarding what he and Ms. Squalls were doing and the officers grabbed his arms when he turned away from them after an awkward moment of silence in the conversation. The Court did not find this testimony credible and credits Officer Martin's testimony regarding the sequence of events. There were a number of other instances of conflicting testimony between Hurd's and/or Ms. Squalls' testimony and Officer Martin's testimony, none of which the Court finds relevant to the legal analysis.

reluctance to take his hands out of his jacket pockets" combined with circumstances of stop justified protective pat-down).[5]

In addition, the search revealing the weapon in Hurd's pocket did not exceed the scope of a lawful pat-down. *Terry* permits a law enforcement officer to conduct a frisk of a suspect's outer clothing that is "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29. During the protective frisk, the officers attempted to physically remove Hurd's hands from his pockets, including grabbing hold of Hurd's wrist in his pocket to attempt to remove Hurd's hands. These actions were justified given Hurd's refusal to remove his hands from his pockets in order to allow the officers to effectively pat-down his pockets. Once Officer Martin felt and observed a gun in Defendant's pocket, he was justified in reaching into the pocket and seizing it. *Harris*, 313 F.3d at 1237 ("If the officer discovers what he believes to be a weapon, he may reach inside the suspect's clothing and remove it.").

**Arrest.** Suppression of evidence based upon an unlawful arrest of Defendant is not required. Officers had probable cause to arrest of Hurd after finding the gun in Defendant's pocket. *See Terry*, 392 U.S. at 30-31 (probable cause to arrest because firearm found during valid investigatory detention and pat-down); *United States v. Archer*, 840 F.2d 567, 571 (8th Cir. 1998) (once a weapon was found during a search, there was probable cause to arrest defendant); *United States v. Thomas*, 992 F.2d 201, 204 (8th Cir. 1993) ("Once [the officer] opened the

---

[5] *See also, e.g.*, *United Sates v. Dubose*, 579 F.3d 117, 122 (1st Cir. 2009) (combination of defendant's brief encounter with car occupants leaning into driver's side in suspected drug transaction, defendant's initial refusal to follow officer's order to remove his hand from his pocket, and his nervousness during his encounter with officer, together with officer's experience in dealing with drug transactions that often involve guns, were sufficient to justify a pat-down of defendant); *United States v. Harris,* 313 F.3d 1228, 1236 (10th Cir. 2002) (officer was justified in conducting a protective frisk of defendant's clothing primarily because "[d]efendant] refused to take his hands out of his pockets after [police officer] requested that he do so").

8

compartment and retrieved a loaded semiautomatic weapon, he clearly had probable cause to arrest [defendant].").

Based upon the foregoing Findings and Conclusions, the Magistrate Judge makes the following:

## RECOMMENDATION

The Court hereby recommends that Defendant Chandan Prentiss Hurd's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 28] be **denied**.

Dated: September 20, 2013
                                                  s/Arthur J. Boylan
                                                  Arthur J. Boylan
                                                  United States Chief Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court on or before October 4, 2013.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within ten days of receipt of the Report.